ROBERT A. MORISON, APPELLANT, V. FREMONT JOINT STOCK
LAND BANK ET AL., APPELLEES.

FILED JANUARY 7, 1936. No. 29421.

*Johnsen, Gross & Crawford* and *Merrow & Murphy,* for
appellant.

*Good, Good & Kirpatrick, Mark Simons, John W. Holou-
bek* and *H. L. Mossman, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, PAINE
and CARTER, JJ.

GOSS, C. J.

This is a suit to compel defendant to specifically per-
form an agreement with plaintiff and to cancel a deed
to approximately 460 acres of Sarpy county land deeded
by defendant bank to defendants Holoubek or to quiet title
in plaintiff as against all defendants.

The bank had foreclosed a mortgage held by it against
the mortgagors and against Morison who had become
the record owner subject to the mortgage. Plaintiff
was desirous of redeeming the land. On June 16, 1933,
he had an interview with W. E. Barkley, vice-president
and general manager of the bank, in his office at Lincoln
and came to terms on the subject. Mr. Barkley took him
to Fred M. Deweese, attorney for the company, and Mr.
Deweese dictated a letter containing the terms of the
agreement as follows:

"June 16, 1933.
"Mr. Robert A. Morison,
"Omaha, Nebr.
"Dear Sir:

"Re: Seefus, N-097-e.

"You have just had a conversation with Mr. Barkley in my presence in which he agreed to accept $18,000 for an assignment of all the Land Bank's rights included in this loan provided payment is made by August 1, 1933. If payment cannot be made on August 1, 1933, it will be accepted within the next thirty days with interest at 6% from August 1st.

"The property will be offered for sale by the sheriff in the foreclosure proceedings and the Land Bank will make a bid for the amount due to it under its decree plus interest and costs and if you purchase the Land Bank's interests the bid can be assigned to any one named by you.

"Yours very truly,
"Fred M. Deweese, Atty."

"In event of purchase of this land by me it is agreed that I am to pay court costs in connection with same from this date.

"Robt. A. Morison."

The letter was submitted to Mr. Barkley, was approved by him, was signed by Mr. Deweese and delivered to Morison. Plaintiff did not exercise his rights merely to take an assignment of the bank's interests under the contract or option or whatever the instrument is, but the other alternative contemplated was followed. Judicial sale was had and the bank bid in the property, cutting out other liens. In the meantime, in August, complications arose, not of Morison's making, which made it impossible for Morison to carry out the contract by September 1. On October 10, 1933, the property was sold on a written contract and conveyed, on October 20, 1933, by the bank to the defendants Holoubek as joint tenants.

The postscript of the letter quoted was not put upon the

original taken away by Morison, but was written by him upon the carbon kept in the bank's file. Although Morison had the title to the land, the evidence shows that it was necessary to eliminate liens subsequent to that of the bank before Morison could raise enough money to handle the land. So the words "purchase the land" had a meaning; the inference is that the bank intended not exactly to "make an assignment of all the land bank's rights included in this loan" by assigning the decree, but actually to get a good title at judicial sale and to deed to plaintiff its interests thus acquired. Inferentially this was the definite understanding between Barkley and Morison. When it was suggested on June 16, 1933, to fix an upset date of August 1 for closing the deal, Morison said that it might not be long enough for the bank to secure the deed or for Morison to arrange the mortgage papers through the Federal Land Bank and a land bank commissioner loan, which had been discussed as a means for plaintiff to raise the money. Mr. Barkley authorized Mr. Deweese to prepare the memorandum, giving until September 1, 1933, to close the deal. Plaintiff withdrew his request for stay theretofore filed and the bank proceeded to have the property sold at judicial sale and to try to get the title in readiness to carry out its part of the arrangement to convey title free from encumbrance subsequent to its own mortgage lien. From the dealings, acts and conversations of the parties, that, we think, was what they both thought was the nature of the engagement between them. Time was not expressly made the essence of the contract. It was the implication of all the circumstances then known that sufficient time had been fixed for the bank to get ready to convey a merchantable title and for Morison to raise his money through the sources named. If unexpected crcumstances of delay arose later, the contract did not in terms cut off their consideration.

The bank now says that all other things were merged in the letter of June 16, 1933, and that it was in effect a mere option granted to plaintiff by the bank, to be exer-

cised strictly within the time limited. "The letter killeth, but the spirit maketh to live."

Morison would have been ready with his money in time, but one Warren intervened, August 1, 1933, with a motion in the suit, claiming that Barkley had, on June 1, 1933, agreed to sell him the bank's rights for $20,000. This showed on the abstract and made it so hazardous that the federal agencies halted action on the loan until the claim was out of the way. Warren appealed (in the same title as the instant case) from the confirmation and that put it beyond the power of the bank either to assign its rights or bid or to convey a merchantable title of its interests or of the land until the mandate favorable to the bank in that proceeding came down from the supreme court in April, 1934. It was not the fault of Morison that Warren intervened. We do not mean to imply that it was the fault of the bank. But, in view of the fact of the intervention of Warren, claimed to be based upon an agreement with the bank's authorized agent, which, if sustained, would have destroyed the agreement with Morison, the bank acted contrary to the equities in declaring the contract with Morison at an end and in selling the land to another. The position of the bank is legally very technical and in our judgment cannot stand against the equities in favor of Morison.

Time is not generally considered as the essence of a contract, unless it is expressly so provided or it appears that such was the intention of the parties. *J. H. Melville Lumber Co. v. Welpton Lumber Co.*, 121 Neb. 370; 236 N. W. 438; *Brown v. Ulrich*, 48 Neb. 409, 67 N. W. 168; *Langan v. Thummel*, 24 Neb. 265, 38 N. W. 782.

The Holoubeks had notice of the claims of Morison. Their contract with the bank provided that the bank was to furnish an abstract showing merchantable title. They had made to the bank a written offer for the land on October 10, 1933. On October 20, 1933, duplicate letters were signed by them making some modification of their former offer. In these duplicate letters the bank was

108

careful to have the Holoubeks include a statement that the attorney for the Holoubeks had examined the abstract and approved the title and that they accepted the title "knowing of the *lis pendens* filed by Morison." That *lis pendens* was filed in Sarpy county September 5, 1933. It may have lacked in power to give constructive notice, and hence the admission of actual notice by the Holoubeks before they purchased the property. In the *lis pendens* Morison gave notice that he was the owner under the contract with the bank dated June 16, 1933.

A purchaser of real property, who has actual knowledge of the assertion by a third party of a claim to such property under a prior contract, takes subject to the legal rights of such third party against the vendor. *Mulligan v. Snavely,* 117 Neb. 765, 223 N. W. 8.

The judgment is reversed, with directions to the district court to order the bank to convey the land involved herein to plaintiff, upon his payment, within 60 days from the issuance of the mandate, of $18,000 and interest at 6 per cent. thereon for one month to the Fremont Joint Stock Land Bank; and to order the cancelation of the deed of said bank to defendants Holoubek, and to make such other incidental orders as may be necessary to carry this into effect.

REVERSED.